645 P.2d 1267

Michelle Marie BRYAN,
Petitioner/Appellant,

v.

David Howe BRYAN,
Respondent/Appellee.

No. 2 CA–CIV 4136.

Court of Appeals of Arizona,
Division 2.

April 23, 1982.

354

Croxen & Baran by Edith A. Croxen, Tucson, for petitioner/appellant.

Jack J. Rappeport, Tucson, for respondent/appellee.

## OPINION

BIRDSALL, Judge.

The question presented in this appeal is whether a stepparent who stands *in loco parentis* to a stepchild may be granted visitation rights when the marriage of the stepparent and the child's natural parent is dissolved.

The appellant, who was then the mother of an infant child by another man, married the appellee in 1979. The marriage was dissolved by a decree of dissolution originally entered on January 21, 1981, and amended on April 17, 1981. In findings made a part of that decree, the court specifically found that the appellee stood *in loco parentis*[1] to the child, that he had in all respects cared for and treated the child as his own,

---

1. *In loco parentis* is a status embodying two ideas; first, the assumption of a parental status, and second, the discharge of parental duties, *Spells v. Spells, infra.*

and that the best interests of the child would be served by granting him visitation rights. In both the original and amended decrees, the court granted visitation rights to the appellee. This appeal is from that portion of the amended decree.

The appellant makes three complaints about the award of visitation rights:

1) that the court had no jurisdiction to determine custody of the child, and therefore could not award visitation rights;

2) that visitation rights, even in a jurisdictionally sound custody proceeding, may be awarded only to parents, not to stepparents; and

3) that even if visitation rights may be granted to stepparents, the court abused its discretion in this case.

## JURISDICTION

■ Visitation rights, whether viewed as a limited form of custody or as a limitation upon the custody rights of another, may be granted only in a jurisdictionally sound custody proceeding. The appellant contends that the court in a marriage dissolution has jurisdiction to determine custody only if both parties to the proceeding are parents of the child.

■ Jurisdiction to determine custody in a dissolution proceeding is controlled by A.R.S. § 25–331:

"A. Jurisdiction for child custody proceedings will be governed by title 8, chapter 4, article 1.

B. A child custody proceeding is commenced in the superior court:

1. By a parent, by filing a petition:

(a) For dissolution or legal separation; or

(b) For custody of the child in the county in which the child is permanently resident or found; or

2. By a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, but only if he is not in the physical custody of one of his parents."

It is undisputed that the child in this case was domiciled in Arizona, as required by A.R.S. § 8–403(A)(1), the pertinent section of title 8, chapter 4, article 1. It is also undisputed that the appellant, a "parent" under any reasonable definition of that term, filed the petition for dissolution that began the proceeding below. A literal reading of A.R.S. § 25–331(B)(1)(a) would therefore indicate that the appellant, by filing her petition, also commenced a child custody proceeding.

The appellant, however, argues that this statute is ambiguous and should not be read literally. The legislature, she contends, did not intend for custody of children to be determined in a marriage dissolution unless both parties are parents of the child. A careful review of past and present statutes, however, reveals several indications that the legislature did not intend to limit custody jurisdiction in that manner.

Previous divorce statutes of this state did contain language that arguably limited the divorce court's custody jurisdiction to children born to, or adopted by, the parties. A.R.S. § 25–319, as it existed before the 1973 revision of title 25, granted jurisdiction to determine custody of "minor children of the parties." That statute's immediate predecessor, § 27–810 of the Code of 1939, granted jurisdiction as to "children of the marriage." Such language has been held to deprive the court of jurisdiction to determine custody under circumstances similar to those of this case. *Perry v. Superior Court,* 108 Cal.App.3d 480, 166 Cal.Rptr. 583 (1980).[2] *But See State v. Taylor,* 125 Kan. 594, 264 P. 1069 (1928) (holding that a stepchild is a "child of the marriage" where the

---

2. *Perry* differed from this case because there was no finding that the stepfather stood *in loco parentis.* A special concurrence in the 3–2 result, by Justice Hopper, suggests that the result might have been different if the finding made in this case had been made there.

stepparent stands *in loco parentis*). Similar limiting language does not appear in the present statute.

Such language does appear, however, in another statute. A.R.S. § 25–312 lists the findings that must be made before a decree of dissolution may be entered. Paragraph 4 of that section requires a finding that:

"To the extent it has jurisdiction to do so, the court has considered, approved and made provision for child custody, the support of any natural or adopted child common to the parties of the marriage entitled to support, the maintenance of either spouse and the disposition of property."

We find it significant that the limiting phrase "common to the parties of the marriage" appears only in the clause of the statute concerning child support, and not in the clause concerning child custody. It appears that the legislature intended to retain the previously established rule that a stepparent could not be required to pay child support, e.g., *Needel v. Needel*, 15 Ariz.App. 471, 489 P.2d 729 (1971), but assumed that children not "common to the parties" would nevertheless be subject to the court's jurisdiction to determine matters of custody. *See In re Marriage of Allen*, 28 Wash.App. 637, 626 P.2d 16 (1981).

■ Our legislature, therefore, has departed from the rule stated in 27B C.J.S. Divorce § 303, p. 426:

"In a divorce suit, the court does not have the power to provide for the care and custody of stepchildren, since there is no common obligation on the parties to the divorce suit for their support."

That rule arises from an outmoded view that custody and visitation rights are primarily a benefit to the parent, to be enjoyed in compensation for the duty to support. This state, however, has long recognized that in matters of child custody it is the welfare of the child, not the gratification of the parent, that is paramount, e.g., *Orezza v. Ramirez*, 19 Ariz.App. 405, 507 P.2d 1017 (1973). Visitation rights, in particular, are not solely for the benefit of the adult visitor, but are intended to contribute to the child's well-being by allowing at least partial continuance of an earlier established close relationship. *Looper v. McManus*, 581 P.2d 487, 488 (Okl.App.1978). Adherence to these principles requires abandonment of a rule that views visitation rights as a benefit available only to persons having a duty to support the child.

We do realize that, under other circumstances, a literal reading of A.R.S. § 25–331(B)(1) could lead to unintended, arguably absurd results. Where custody of a child has previously been awarded to a parent's former spouse, for example, and the non-custodial parent later files a petition for dissolution of a subsequent marriage, it seems doubtful that the legislature intended a redetermination of custody. We do not doubt, however, that a custody determination was intended when a parent having custody, such as the appellant, seeks dissolution of a marriage. The state has a legitimate interest in the welfare of any child whose home is being divided by its laws, and that interest is equally strong regardless of whether the marriage being dissolved is that of both, or only one, of the child's parents. We therefore hold that the proceeding below was a jurisdictionally sound custody proceeding.

THE STEPPARENT AS "VISITOR"

■ Since dissolution of marriage is a purely statutory action having no common law origin,[3] the court presiding over such an action has only such express or incidental

3. At the time of American independence, the English ecclesiastical courts were empowered to annul a marriage or to grant a divorce *a mensa et thoro*, the rough equivalent of modern legal separation. This has led at least one court to conclude that those powers became

"common-law" powers of American courts. *Eaton v. Davis*, 176 Va. 330, 10 S.E.2d 893 (1940). It is universally agreed, however, that divorce *a vinculo matrimonii*, a dissolution of the marriage contract, is derived from neither the English nor the American common law.

powers as are conferred by statute. The appellant therefore argues that A.R.S. § 25–337 confers only the power to grant visitation rights to "parents." She defines a parent as "one who begets offspring," thus excluding the appellee (and, we might add, adoptive parents).

A.R.S. § 25–337 provides, in pertinent part:

"A. A parent not granted custody of the child is entitled to reasonable visitation rights to ensure that the minor child has frequent and continuing contact with the non-custodial parent unless the court finds, after a hearing, that visitation would endanger seriously the child's physical, mental, moral or emotional health.

B. The court may modify an order granting or denying visitation rights whenever modification would serve the best interest of the child, but the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional health."

█ If that statute were actually the source of the court's authority to grant visitation rights, there might be merit in the appellant's claim. We believe, however, that the statute is intended to bestow special protection upon the visitation rights of parents,[4] not to grant the court authority to award visitation rights. That authority was recognized as an incident of the expressly granted authority to determine matters of custody long before the 1973 adoption of the present statute. *See McFadden v. McFadden*, 22 Ariz. 246, 196 P. 452 (1921).

█ Finding that the court has authority to grant visitation rights, but also finding

that the statutes do not specify to whom those rights may be granted, we must return to the starting point of any custody determination. The court must determine custody in accordance with the best interests of the child. A.R.S. § 25–319. The law generally presumes that the best interest of the child will be served by granting custody to a natural parent, and where there is only one natural parent, it is presumed that the custody should be uninterrupted.

█ Despite these presumptions, the court in a divorce or marriage dissolution is not bound to award custody to either of the child's natural parents and may, in an appropriate case, award custody even to a stranger. *Ballew v. Ballew*, 288 S.W.2d 24 (Mo.App.1956); *Ex parte Lukasik*, 108 Cal. App.2d 438, 239 P.2d 492 (1951); *Hodges v. Hodges*, 77 Ga.App. 86, 47 S.E.2d 823 (1948); *Randolph v. Randolph*, 146 Fla. 491, 1 So.2d 480 (1941); *Barry v. Sparks*, 306 Mass. 80, 27 N.E.2d 728, 128 A.L.R. 983 (1940); 27B C.J.S. Divorce § 308(c). When a third person seeks full custody of the child in a contest with a natural parent, the presumption in favor of the natural parent may be overcome only by a clear showing that the natural parent is unfit. *Woodford v. Superior Court*, 82 Ariz. 181, 309 P.2d 973 (1957).

Applying these principles, our own supreme court has held that a stepparent may be granted custody as against the natural parent. In *Clifford v. Woodford*, 83 Ariz. 257, 320 P.2d 452 (1957) a natural father, Clifford, brought a habeas corpus action to obtain custody of his daughters. The daughters were then in the custody of their stepfather, Woodford, following the death of the natural mother, who had previously been awarded custody in her divorce from Clifford. Woodford counterclaimed for

---

*See* cases cited at 27A C.J.S. Divorce § 69. We therefore ignore the rule of reliance upon the common law, found in A.R.S. § 1–201.

**4.** The statute, almost identical to § 407 of the Uniform Marriage and Divorce Act, 9A U.L.A. 91 et seq., is intended to overrule cases such as

*Badertscher v. Badertscher*, 10 Ariz.App. 501, 460 P.2d 37 (1969), holding that a parent could be denied visitation rights if the best interest of the child would be served. *See Simpson v. Simpson*, 586 S.W.2d 33 (Ky.1979).

guardianship of the children and prevailed in the trial court. The supreme court affirmed.

Because of the significant differences in procedure between *Clifford* and the case at bar, that case cannot be considered controlling here. We believe it is significant, however, for two related reasons. First, although the supreme court purported to be following the presumption stated above, it is evident from the facts set forth in the opinion (and resurrected in the dissent) that a lesser showing was required to overcome that presumption. After concluding that the evidence had been sufficient to support the award of custody to the stepfather, the court stated:

"Woodford assigns as error on his cross-appeal the inclusion of the following statement of the trial judge in his order and judgment of May 7, 1957:

'Nothing herein in any way reflects adversely upon the character, the morals or the fine home and family of Mr. and Mrs. Clifford.'

Woodford contends that the evidence shows Clifford to be unfit to assume the responsibilities of parenthood. Clifford contends that the court completely disregarded this statement (which he designates as a finding) in awarding custody of the children to Woodford. We agree with the view that the conduct of Clifford toward his children from their infancy to the date of trial evidences but little, if any, love or affection for them and a minimum of interest in them, but we see no prejudicial error in the above statement of the trial judge. There is nothing in the evidence that reflects upon his home or indicates that it is not a comfortable home. He is not shown to be immoral as the term is generally used, and certainly there is nothing to indicate that Charlotte, his wife, is not a lovely lady." 83 Ariz. at 267, 320 P.2d at 458.

The second significant aspect of *Clifford*, perhaps explanatory of the first, is the court's poignant assessment of the relationship that often exists between child and stepparent:

"Woodford and the mother of these children during the period of their helplessness in their early infancy necessarily cared for them day and night. They unquestionably shared with them in all their childish joys and disappointments to the date of their mother's death in November, 1956. In that tragic event Woodford walked beside them in their hour of supreme need into the greatest depth of despair to which the human heart can descend or is ever called upon to endure. The evidence shows he loved them as he did his own and they unstintedly returned his love in full measure.

The ties that cement the members of a family into a unit of solidarity is (sic) not necessarily the result of blood relation, but they arise out of and are formed by an intimate association sharing with each other the joys and sorrows, the fears and hopes, the successes and failures of each and all. There is a deep seated desire in the breast of every person, whether child or adult, to have some one care about their welfare to whom they may anchor and find peace and contentment in the knowledge that they do care. Jacqueline and Gretchen have found such an anchor in Woodford." 83 Ariz. at 265, 320 P.2d at 457.

Despite the relative abundance of cases concerning full custody disputes between natural parents and third persons (frequently stepparents), there has until recently been a paucity of authority concerning the efforts of stepparents to obtain, not custody of children, but visitation rights. In recent years, however, the courts of at least six states have held that a stepparent who stands *in loco parentis* may be granted visitation rights in a marriage dissolution. *Looper v. McManus, supra; Simpson v. Simpson, supra* fn. 4; *Spells v. Spells,* 250 Pa.Super. 168, 378 A.2d 879 (1977); *Gribble v. Gribble,* 583 P.2d 64, 1 A.L.R.4th 1263 (Utah, 1978); *Collins v. Gilbreath,* 403

N.E.2d 921 (Ind.App.1980); *Wills v. Wills,* 399 So.2d 1130 (Fla.App.1981).

■■■ As must often be true in cases concerning the custody of children, the opinions in the cited cases show a certain disregard for largely heuristic, academic rules in an effort to reconcile the best interest of the child and the favored status of natural parents. If there is a rule to be fairly drawn from those opinions, it is that stated in *Commonwealth ex rel. Williams v. Miller,* 254 Pa.Super. 227, 385 A.2d 992, 994 (1978):

> "When seeking visitation, a third party must show reasons to overcome the parent's prima facie right to uninterrupted custody. However, the reasons need not be so convincing as in a custody case. In a custody case, the third party must convince the court that it is in the child's best interest *to take custody* from a parent and award it to the third party. In a visitation case, the third party need only convince the court that it is in the child's best interest *to give some time* to the third party. As the amount of time requested moves the visit further from a visit and closer to custody, the reasons offered in support of the request must become correspondingly more convincing." (emphasis in original)

With specific regard to stepparents, we construe the cases to say that the showing of an *in loco parentis* relationship between child and stepparent, together with evidence that the best interest of the child will be served by allowing a partial continuance of that relationship, may provide sufficient reason to limit the presumptive right of the natural parent to uninterrupted custody. Although the law of this state has accorded varying degrees of deference to the *in loco parentis* status in other contexts,[5] we believe the statement just uttered to be consistent with the pronouncements of our su-

preme court in the analogous setting of *Clifford v. Woodford, supra,* without "open[ing] the door to the butcher, the baker and the candlestick maker," *Simpson v. Simpson, supra* fn. 4 (Stephenson, J., dissenting). We are confident that trial courts will not lightly infringe upon the favored rights of natural parents and that faithful service to the best interest of the child will preclude the granting of visitation rights to a series of successive stepparents. We hold that the court below did not err in considering the appellee as a candidate for visitation rights.

## EXERCISE OF DISCRETION

■■■ The final question presented is whether the court below abused its discretion in determining that granting visitation rights to the appellee would be in the best interest of the child under the circumstances. In reviewing this exercise of discretion, we may not substitute our own judgment for that of the trial court, and must affirm its ruling if there was evidence to support it, even if we might have ruled otherwise. *Larsen v. Larsen,* 11 Ariz.App. 539, 466 P.2d 412 (1970).

■■■ The appellant's principal contention is that the evidence showed the appellee to be abusive to the child. The strongest evidence on this point was the appellant's testimony that the appellee frequently spanked the child to make her stop crying during the night. The appellee denied this. The trial court was free to disregard the testimony of the appellant, an interested party. *Hayne v. Hayne,* 9 Ariz.App. 99, 449 P.2d 663 (1969).

■■■ Assuming that the court disbelieved the appellant, the only other evidence of physical discipline came from the appellant's mother, who had lived with the parties for about six months, and from the

---

5. *See,* e.g., *Solomon v. Harman,* 107 Ariz. 426, 489 P.2d 236 (1971) (foster parents not entitled to recover under wrongful death statute despite claimed *in loco parentis* relationship with de-

ceased child); *In Re Harris,* 16 Ariz. 1, 140 P. 825 (1914) (treating *in loco parentis* "parent" as the law would a natural parent and denying recovery of amounts expended for support).

appellee himself. The mother, without specifying the transgressions of the child that required discipline, testified that the appellee "very often" hit the child "on the fanny and on the legs," and had once "force fed" the child and caused her to choke. The appellee admitted that he had spanked the child from the time she was about one year old, but stated that he spanked only on the child's diaper and not hard enough to hurt her. Given the wide differences among reasonable minds on the propriety of corporeal discipline, the court certainly did not abuse its discretion in determining that the appellee's conduct did not constitute "abuse."

The appellee also called several witnesses. His grandmother, his stepfather and two of his neighbors testified that they had observed his interaction with the child, that the relationship between the two appeared to be a close, loving one, and that the appellee treated the child as a father would his own. The appellee had lived with the child from the time she was two months old until the appellant removed her from the household several months before the dissolution proceedings began. The appellant admitted that the appellee had been the child's only "father figure" during this period which, although short by some standards, was most of the child's life. From this evidence we believe the court could easily have concluded that the appellee was "the only genuine father [she had] ever really known," *Clifford, supra*, 83 Ariz. at 266, 320 P.2d at 458, and that the child's best interest would be served by providing for some continuance of that relationship.

Affirmed.

HOWARD, C. J., and HATHAWAY, J., concur.